**Robert Livingston POMEROY, Executor, Estate of Elizabeth Eagan Pomeroy, Appellant,**

v.

**PENNSYLVANIA RAILROAD, a corporation, Appellee.**

**No. 12104.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1954.

Decided Feb. 18, 1955.

**594**

Mr. Hyman Smollar, Washington, D. C., for appellant.

Mr. James H. McGlothlin, Washington, D. C., with whom Mr. James C. McKay, Washington, D. C., was on the brief, for appellee.

Before WILBUR K. MILLER, BAZELON and WASHINGTON, Circuit Judges.

BAZELON, Circuit Judge.

Sixty-nine year old Mrs. Pomeroy and her husband were passengers on a Pennsylvania Railroad train en route from Trenton, New Jersey, to Washington, D. C. About five minutes before the train reached the station in Washington, she told her husband that she felt warm and was going to the vestibule of the car to get some air. She walked toward the rear of the car and was never again seen alive. Later, her body was found on the tracks about 2½ miles from the station.

Her executor brought this suit for wrongful death. The complaint alleged the ownership, operation and control of the train by the defendants; that it was their duty to exercise reasonable care to assure decedent's safe transportation; and that they "disregarding their individual or joint duties * * * and negligently and carelessly neglecting the same, did fail to exercise such reasonable care * * * over the said train, so as to permit the deceased to fall or be thrown therefrom * * *." The answer denied these allegations and pleaded contributory negligence.

At the conclusion of the plaintiff's opening statement, the defendant Pennsylvania Railroad moved for a directed verdict. The trial court granted the motion upon the stated ground that "the vestibule door [through which decedent is claimed to have fallen] was not under the exclusive control of the defendant railroad and there was no offer to prove that the factors outside defendant's control did not bring about the accident * * *." The question before us, as formulated by the parties, is whether the jury might properly have inferred negligence on the part of the defendant from the facts that the decedent fell to her death from a moving train at a point where the track curved; that the vestibule door was open between stations; and that it was highly improbable that she could have opened it herself.[1] The appellant contends that the doctrine of *res ipsa loquitur* applies to these facts so that the jury may properly infer negligence in the absence of contrary proof by the defendant. The appellee, on the other hand, maintains that the doctrine is inapplicable to this state of facts.

The doctrine of *res ipsa loquitur* contains no absolute standards by which to determine its applicability to a given situation. "The phrase is nothing but a picturesque way of describing a balance of probability on a question of fact on which little evidence either way has been presented."[2] The court is required to

---

1. The trial court thought that the opening statement made "no disclaimer that the door could have been opened * * * by the decedent herself," but the appellee concedes that it is "highly improbable that the lady's strength would have enabled her to open the door."

2. Thayer, Liability Without Fault, 29 Harv.L.Rev. 801, 807 (1916). See Wash

decide, in the light of common experience, whether "all the observed facts with the fair inferences from them"[3] could justify a finding by the jury that the defendant was at fault. To attempt to decide that question without considering "all of the observed facts" assumes a heavier burden than logic demands. Yet that is what the trial court appears to have done and what we are asked to do.[4]

The opening statement here offered to establish more facts than are comprised within the question presented on appeal. The determination of the applicability of the doctrine ought, therefore, to have been postponed until the ascertainment of those additional facts. From the opening statement, this is not merely a case of an unexplained fall from a moving train. The plaintiff offered to prove that a brakeman had found the vestibule door open at approximately the point where decedent's body was later found and that he had thought the circumstance of the door being open was not unusual. Plaintiff's counsel added that " * * * we will tell you more about that door later * * *." He offered to prove further that there was a curve in the track at about the point where the accident occurred, saying, "The amount of the curve I don't know but it will be established on the witness stand by employees of the [railroad]." He concluded by asserting that the railroad was negligent in keeping the vestibule door open between stations.

Without expressing any opinion as to whether a jury could possibly infer negligence from the naked facts stated in the formulated question, we think it clear that the possibility of reasonable inference can more intelligently be judged after presentation of the offered proof about the circumstances of the accident. We do not read the opening statement as a mere assertion of liability to be inferred from the fact of an open vestibule door, but rather as an offer to prove, through the employees of the railroad, circumstances from which the jury can infer that the railroad negligently kept the door open, thereby causing the accident. To be sure, plaintiff's counsel failed to spell out with any specificity what testimony he expected from the employees of the railroad. But an opening statement "is ordinarily intended to do no more than to inform the jury in a general way of the nature of the action and defense so that they may better be prepared to understand the evidence"; and, to direct a verdict upon an opening statement, "it must clearly appear, after resolving all doubts in plaintiff's favor, that no cause of action exists."[5]

The trial court reached the question of the applicability of the doctrine of *res ipsa loquitur* after first determining that the alternative theory of specific negligence had been abandoned by the plaintiff's counsel in the opening statement and an ensuing colloquy at the bench. We think that determination as

ington Loan & Trust Co. v. Hickey, 1943, 78 U.S.App.D.C. 59, 61, 137 F.2d 677, 679.

3. 3 Cooley on Torts (1932), p. 372, citing Washburn v. R. F. Owens Co., 252 Mass. 47, 147 N.E. 564.

4. The situation is different where the opening statement clearly delimits the scope of the evidence to be expected. See, e. g., Greene v. Hathaway, 1951, 89 U.S.App.D.C. 229, 191 F.2d 656, 657, where we held that the evidence promised in the opening statement made a case for the plaintiff and we reversed a judgment entered upon a directed verdict in favor of the defendant. That was a case of a child falling out of a taxicab.

In the opening statement, plaintiff's counsel said: " 'For no apparent reason the door of the cab, the left rear door, came open, and Ceicley, the child, was thrown out. * * * Our evidence will show that no person in that cab touched or did anything to that door which could normally be expected to cause it to open.' " Assuming those facts, we had before us all of the observed or observable facts that were necessary for a determination of whether a jury could reasonably find negligence in the maintenance or operation of the vehicle.

5. Best v. District of Columbia, 1934, 291 U.S. 411, 415–416, 54 S.Ct. 487, 489, 78 L.Ed. 882.

well could profitably have been postponed until presentation of the plaintiff's proof.[6] Plaintiff's counsel stated in the colloquy that he was not "contending" there was specific negligence, "unless it develops in the course of the trial," and that he was "relying" on the doctrine of res ipsa loquitur.[7] Reading these words in context, we are not as ready as the trial court to conclude that a position taken in the complaint, reiterated at pre-trial,[8] and reaffirmed in the opening statement to the jury, was intended to be "abandoned" for no apparent reason in the colloquy. In the very sentence in which he is asserted to have abandoned his claim of specific negligence, plaintiff's counsel said, " * * * unless it [specific negligence] develops in the course of the trial." Counsel's answer "I am," which followed the court's statement that counsel was "relying" not on specific negligence but on res ipsa loquitur, can fairly be read as limited by the same conditional clause.[9] To bar appellant on this basis from establishing his theory of specific negligence would be to deny him the right to go to the jury with alternative causes of action, a right which has not been in doubt since the adoption of the Federal Rules of Civil Procedure.[10] The residu-um of ambiguity as to whether the theory of specific negligence was intended to be abandoned can effectively be resolved after the plaintiff has had an opportunity to examine the witnesses. If, after the plaintiff's case is in, the motion for a directed verdict is renewed and the trial court finds there is no evidence of specific negligence, it is time enough to consider the substantive question of the applicability of the doctrine of res ipsa loquitur.

Reversed and remanded for a new trial.

WILBUR K. MILLER, Circuit Judge (dissenting).

I cannot go along with my brothers of the majority, as it seems to me the trial judge was clearly correct in directing a verdict for the defendant on the opening statement of counsel for the plaintiff.

According to the statement, Mrs. Pomeroy left her seat and went toward the back of the coach. She was not seen thereafter by anyone until, some hours later, her body was discovered about two and one-half miles from the Union Station. "That is the only thing we know about it," said plaintiff's counsel to the jury, "except what the facts developed

---

6. Cf. Safeway Stores v. West, 86 U.S. App.D.C. 99, 180 F.2d 25, certiorari denied, 1950, 339 U.S. 952, 70 S.Ct. 840, 94 L.Ed. 1365, where, as here, the complaint was grounded upon specific negligence as well as res ipsa loquitur. In that case, after pre-trial, the specific negligence theory was "tacitly abandoned" and the case was rested on res ipsa loquitur, but the direction of the verdict occurred only after completion of the plaintiff's case.

7. The colloquy was as follows:
"The Court: You are relying on the doctrine of res ipsa loquitur?
"Mr. Smollar [Counsel for plaintiff]: Yes, I am.
"The Court: In other words, I don't think Mr. Smollar is contending that there was any specific negligence, are you?
"Mr. Smollar: No, unless it develops in the course of the trial, Your Honor, but I am not contending that.
"The Court: I understand you to say that you are not relying on specific neg-ligence but you are relying on the doctrine of res ipsa loquitur.
"Mr. Smollar: Yes, I am."

8. The sufficiency of the allegation of negligence in the complaint was sustained by the trial court at the pre-trial hearing.

9. See Anderson v. Missouri State Life Ins. Co., 6 Cir., 1934, 69 F.2d 794, 797: " * * * it is axiomatic that in order to sustain a judgment upon a mere statement, admissions must clearly preclude recovery or defense, and broad and liberal interpretation must be made without too precise limitation of the meaning of specific words and phrases."

10. Fed.R.Civ.P. 8, 28 U.S.C.; McGhee v. United States, D.C.S.D.N.Y.1947, 75 F. Supp. 76, 83; see also Smith v. Pennsylvania Central Airlines Corp., D.C.D.C. 1948, 76 F.Supp. 940, 942; cf. Washington Loan & Trust Co. v. Hickey, 1943, 78 U.S.App.D.C. 59, 61, 137 F.2d 677, 679.

later." Counsel mentioned no later-developed facts, except that there was a curve in the track at the point where it is supposed Mrs. Pomeroy fell from the train; and that, a short time after she fell, a brakeman passing through the coach found the vestibule door open.[1]

Such are the only facts stated upon which plaintiff sought damages from the railroad company. There was no offer to prove who opened the door, nor how long it had been open when the brakeman discovered it. It is common knowledge that for safety reasons vestibule doors are not kept locked and can be opened by any person of ordinary strength. Yet there was no offer to show the door had not been opened by the decedent herself or by some other passenger, except the suggestion that it was highly improbable that Mrs. Pomeroy would have been strong enough to open it.

The trial judge aptly and succinctly stated the applicable principles of law when he said:

"Under this set of facts, assuming that the jury should have found all the facts stated by plaintiff's counsel in his opening statement to be true and gathered all reasonable inferences therefrom, it would have been required to speculate as to whether the accident resulted from some cause within the railroad's control or from the act of some third person or the decedent herself.

"In view of the fact that the vestibule door was not under the exclusive control of the defendant railroad and there was no offer to prove that the factors outside defendant's

[1]. The following paragraphs quoted from the statement are those in which counsel outlined the proof upon which he would rely as showing negligence on the part of the railroad company:

"That about five minutes before the train was scheduled to reach the Union Station in Washington Mrs. Pomeroy had touched Mr. Pomeroy's shoulder and told him she was feeling very warm and was going out to get some air and would he get the baggage down from the baggage carriers, or whatever they might have been, and get ready to go.

"This was the last that Mrs. Pomeroy was seen by anybody alive. She went toward the back of the car. That is the only thing we know about it except what the facts developed later.

\* \* \* \* \*

"The evidence will show, and we agree on this, incidentally, that sometime about a point two and one-half to three miles outside of Washington the brakeman, Mr. William F. Harrison, while passing through the car noticed that the vestibule door, that is the door going off the train—and we will tell you more about that door later—the vestibule door was open.

"The evidence will show that this door which is used for passengers leaving the train and passengers boarding the train is what can be described as a dutch door; it has two halves, a bottom half and a top half. In order to open the lower half one must open the top half, and then the lower half is hinged and that swings open and latches up against the front of the car. The bottom half has a knob which has to be turned and pulled back in order to be latched against the side of the car.

"The evidence will show that the body of Mrs. Pomeroy was found about two and one-half hours later at a point approximately two and a half miles from the Union Station, so that when she left the car it must have been at least two and a half miles from the Union Station and might have been some few hundred feet more, as the body continued to go until she landed at that signal bridge.

"\* \* \* [T]he evidence will show that although she was a woman of good health she was a frail woman and of not much strength, and 69 years old, and it was highly improbable that a woman of her physical strength and of her age could have opened these doors which are very difficult to open at best by ordinary men.

\* \* \* \* \*

"The evidence will further show that at a point where she was presumed to have left this car, that is fallen from the car in one way or another—there are no eye witnesses as to how she left the car—but the evidence will show that just prior to that point where the train meets the signal bridge there is a curve in the Pennsylvania track at that point; the amount of the curve I don't know but it will be established on the witness stand by employees of the Pennsylvania Railroad Company."

control did not bring about the accident, the doctrine of res ipsa loquitur is inapplicable to the case. * * * "

In my opinion, the following language of the Supreme Court in Pennsylvania R. Co. v. Chamberlain, 1933, 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L.Ed. 819, applies as well to this case as to that one:

"We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover. [Cases cited.]"

The majority say, however, that "From the opening statement, this is not merely a case of an unexplained fall from a moving train." They do not read the statement of plaintiff's counsel "as a mere assertion of liability to be inferred from the fact of an open vestibule door, but rather as an offer to prove, through the employees of the railroad, circumstances from which the jury can infer that the railroad negligently kept the door open, thereby causing the accident."

It is observed, however, that the only thing counsel said he would prove by railroad witnesses was the degree of the curve in the track at the point where it is supposed Mrs. Pomeroy left the train. Counsel said, "[T]he amount of the curve I don't know but it will be established on the witness stand by employees of the Pennsylvania Railroad Company." I suggest that the curve, whatever its degree, is not a fact from which negligence could be inferred. At one point plaintiff's counsel said, "[W]e will tell you more about that [vestibule] door later * *." But he said no more about it except to describe it as a dutch door.

In a bench colloquy following his opening statement, plaintiff's counsel told the court he was relying on the doctrine of res ipsa loquitur and was not contending there was any specific negligence "unless it develops in the course of the trial, Your Honor, but I am not contending that." The majority seem to treat this statement as an offer to prove specific negligence. To me it is no more than an expression of hope that some proof of negligence would unexpectedly appear,—but that what it might be, counsel had no idea.

When plaintiff's counsel could state no negligent act or omission of the railroad company which caused Mrs. Pomeroy's death, and could offer to prove no fact or circumstance from which causal negligence could properly be inferred, the trial judge had no alternative but to direct a verdict. He would not have been justified in permitting plaintiff's counsel to proceed with proof merely because counsel hoped, like Mr. Micawber, that something would turn up. I would affirm the judgment of the District Court.